MINOR *v.* STATE, 36 Miss. R., 630.

### GRAND LARCENY.

The judgment of the circuit court upon an appeal from the decision of a justice of the peace and five slaveholders, convicting a slave of an offense not capital, is final, but not revisable in the High Court of Errors and Appeals.

Error to Warren circuit court. YERGER, J.

*F. Anderson* and *H. J. Harris,* for plaintiff in error.

*T. J. Wharton,* attorney general.

HARRIS, J. :

This cause was originally commenced under the act of February, 1854 (Session Acts, 126), and tried before the justices and slaveholders, according to the provisions of that act. The plaintiff in error was convicted of the crime of grand larceny, and an appeal was prosecuted by him to the circuit court, under the provisions of the eleventh section of said act of 1854.

Another trial was had in the circuit court of said county, and the plaintiff in error was again found guilty of the offense charged against him. A motion was made for a new trial, which was refused. Various bills of exceptions, taken during the progress of the trial, and in the refusal of the motion for a new trial, appear in the record; and a writ of error is now prosecuted *here*, to reverse the judgment in the circuit court.

A preliminary question is raised as to the jurisdiction of this court, and whether a writ of error lies at the suit of a slave to this court, in cases of this character.

As indicating this view, it is said it was the object of the act of 1854 to provide a more summary, cheaper, and more expeditious remedy for the trial of minor offenses charged against slaves, and yet to secure to the slave all just protection against the errors of the inferior court, established for that purpose. Hence the right of appeal to the circuit court, and a trial there according to the usual forms in such trials in the circuit court. If, however, there lies a writ of error in *this court* in such cases, in addition to the right of appeal to the circuit court, it is said the whole object and design of the act is defeated, and an act designed to secure a speedy trial will be thereby converted into an instrument of delay, injustice and oppression to all parties interested; and, indeed, that by such construction the smallest offenses will become, in the mode, and forms, and delays of trial, much more difficult, tedious and expensive, than offenses involving the life of the slave.

To this it is answered, that the general language of the new code, extending the writ of error to *all criminal cases*, and the subsequent act of 1858, making writs of error, *in all criminal cases*, writs of right under certain restrictions, embrace as well this class of cases as any other. And this would seem to be conclusive, unless it shall be found that, from their peculiar character and situation, this inferior class of our population are excepted out of our general legislation, and only included therein when specially named, or are specially excepted by the obvious intent of the act of 1854, the act in question.

This subject is discussed by Mr. Cobb, in his Treatise on the Law of Slavery. After showing the origin and sources of

negro slavery, he comes to treat of the slave as a *person* (§ 86):
"Of the three great absolute rights guaranteed to every citizen
by the common law, viz.: the right of personal security, the
right of personal liberty, and the right of private property, the
slave, in a state of pure or absolute slavery, is totally deprived,
being, as to life, liberty and property, under the absolute and
uncontrolled dominion of his master," &c.   Coke Litt., 116, *b*;
Neal v. Farmer, 9 Georgia R., 555; The State v. Mann, 2
Dev. L. R., 265; Jackson v. Lervey, 5 Cowen, 397; Fable v.
Brown, 2 Hill Chan. R., 396.

He proceeds to remark, that "no such state of slavery, how-
ever, exists in these states," and to note the modifications
growing out of civilization and express legislation.   He then
examines the arguments of different courts on the long-mooted
question, whether, in the absence of statute laws, the homicide
of a slave is punishable as murder, under the general law pre-
scribing the penalty of murder.

"By some courts," he says, "it has been held, that so soon as
the progress of civilization and Christian enlightenment elevated
the slave from the position of a mere chattel, and recognized
him for any purpose as a person, just at that moment the homi-
cide of him, a human being in the peace of the state, with
malice aforethought, was murder.   So long as he remained
purely and unqualifiedly property, an injury upon him was a
trespass upon the master's rights.   When the law, by providing
for his proper nourishment and clothing, by enacting penalties
against the cruel treatment of his master, by providing for his
punishment for crimes, and other similar provisions, recognizes
his existence as a person, he is as a child just born, brought for
the first time within the pale of the law's protecting power.
His *existence* as a person being recognized by the law, *that ex-
istence* is protected by the law; and of this class of cases are
the following: The State v. Tackett, 1 Hawks' R., 217;
McGrew v. Cato's Ex'r, Minor R., 8; Middleton v. Holmes,
3 Porter, 424; The State v. Jones, Walker's Miss. R., 83;
Kelly & Little v. The State, 3 S. & M., 518; Fields v. The State,
1 Yerger, 156; Commonwealth v. Booth, 1 Virginia Cases, 394;
Dolly Chapple's case, 1 ib., 184; Commonwealth v. Turner, 5

Rand., 678; and the Same v. Carver, 5 Rand., 660; Worley v. The State, 11 Humph., 172.

"It has been objected to this conclusion," he says, "that if the general provision of the law against murder should be held to include slaves, why should not *all other penal enactments*, by the same course of reasoning, be held to include similar offenses, when committed on slaves, without their being specially named? The reply made is twofold:

"1. The law, by recognizing *the existence* of the slave, as a person, thereby confers *no rights or privileges except such as are necessary to protect that existence*. All other rights must be granted specially. Hence the penalties for rape would not and should not, by such implications, be made to extend to carnal forcible knowledge of a slave; the offense not affecting *the existence* of the slave, and that *existence* being the extent of the right which the implication of the law grants.

"2. Implications of law will always be rebutted by the general policy of the law; and it is clearly against the policy of the law to extend over this class of the community that character of protection which many of the penal statutes are intended to provide for the citizen."

At section 91 he says: "To all this reasoning and these conclusions other courts have withheld their assent; and while they acknowledge that the feelings of humanity and the dictates of conscience, enlightened by Christianity, would lead them to these conclusions, yet they have been unable, in the law itself, to feel themselves justified in so declaring it. In their view, the slave remains in a state of pure slavery *until relieved by legislative enactment*, and the provisions of these enactments are the extent of their rights and protection; that by the rules for the construction of statutes, which are adapted to regulate the conduct of citizens, slaves are not included in their provisions, *unless specifically named;* that, though murder is defined to be the killing of a human being, &c., yet rape is defined to be the carnal, forcible knowledge of a female; and if the killing of a slave be murder, the carnal, forcible knowledge of a female slave is a rape; and, further, that the fact that every slaveholding state has, by penal enactment, provided punishment for such

offenses, when committed on the persons of slaves, is a legislative declaration that such offenses were, before that time, unprovided for; that the colonies, having adopted the common law, and negro slavery having no existence in Great Britain, there could be necessarily no provision of that law in reference to it; and, consequently, the power of the master, until limited by legislation, was absolute. Neal v. Farmer, 9 Georgia R., 555; Fable v. Brown's Executors, 2 Hill's Ch. R., 395; State v. Fleming, 2 Strobh. 464; 14 Georgia R., 198; and 20 Georgia, 510.

The author then says (sect. 92): "The view we have taken of the law of nature leads us to a different conclusion from either of these, viz., that by that law, and without statutory enactment, the homicide of, or maiming, a negro slave, is prohibited, and unlawful, but that it requires statutory enactment to provide punishment for such offenses."

(Sect. 94.) The protection of the person of the slave depending so completely upon statute law, it becomes a question of importance what words in a statute would extend to this class of individuals. Generally, it would seem that an act of the legislature would operate upon every person within the limits of the state, both *natural* and *artificial*. Yet when the provisions of the statute evidently refer to *natural* persons, the court will not extend them to *artificial*.

Nor will statutes ever be so construed as to lead to absurd or ridiculous conclusions. Experience has proved, what theory would have demonstrated, that masters and slaves cannot be governed by the same laws. So different in position, in rights, in duties, they cannot be the subjects of a common system of laws.

Hence, the conclusion that statutory enactments never extend to, or include, the slave, neither to protect nor to render him responsible, unless specifically named, or included by necessary implication. See Wash v. The State, 14 S. & M., 120; and The State v. Whyte and Sadler, 2 N. & McC., 175; 4 Dev., 340; 1 Scam., 178; 2 Dev., 263; 5 Rand, 678; Cobb's Law of Slavery, §§ 94, 303, 318, 320, 321; State v. Mary Hage, 1 Bailey R., 275; Grady v. The State, 11 Georgia, 253.

In Neal v. Farmer, 14 Georgia R., 579, it is said by Justice Nisbet, in a very able and elaborate opinion on this subject, that " it is theoretically everywhere, and in Georgia experimentally, true, that two races of men living together, one in the character of masters and the other in the character of slaves, cannot be governed by the same laws. Whatever rights humanity, or religion, or policy, may concede to the slave, they must, in the nature of the relation, be often different from those of the master. The forms of proceeding, and the rules of evidence for their protection, as well as the penalties for their violation, must necessarily, in many instances, be different. The civil rights of the master do not appertain to the slave. Of these, he can have none whatever. The rights personal, if they might be so designated, of the slave, are, some of them, essentially different from those of the master, and cannot, therefore, be the subject of a common system of laws. *They must be defined by positive enactments, which, whilst they protect the slave, guard the rights of the master.*" And the same views are expressed by Chief Justice Lumpkin, in Bryan v. Walton, 14 Georgia R., 198, and and 20 ib., 510.

In this state the legislature has adopted a code with express reference to the trial of slaves, defining the offenses, from murder to the lowest offenses; affixing penalties; establishing a special tribunal for their trial, wholly differing in its character from the mode applied to persons who are citizens; regulating the competency of witnesses—how summoned—the mode of compelling their attendance; and providing for the keeping and preservation of its records and papers, and for fees and costs; and finally, for appeal to the circuit court.

It can hardly be supposed, therefore, that in the great number, variety and minute particularity of the provisions, establishing a *system*, having reference to this class alone, it could have escaped the scrutiny of the legislature, if they had so intended to make provision for writs of error also; and the fact, that in an act so carefully considered, and making such important changes, no provision for writs of error to this court is made, is strongly persuasive that none was intended.

Without determining the general question discussed by the

authorities to which we have referred, we think it the manifest intent of the legislature, in all cases not capital, to make the appeal from the jury of triers to the circuit court, and a trial *there*, final; otherwise the whole scope and object of our laws, providing this new and inferior tribunal, would not only be defeated, but the very delay they were intended to prevent, would be thereby created. If the writ of error be allowed in this class of cases, then slaves, free negroes and mulattoes, for the most trivial offenses, will be allowed three distinct trials, any one of which, if found for the defendant, is final; while for capital crimes, involving life, no such provision is made, and while the superior race, the white man, has no such right extended to him, in cases of the greatest magnitude, by our laws.

Statutes will never be construed so as to lead to conclusions so absurd. Smith's Commentaries, §§ 517, 518; United States v. Fisher, 2 Cranch, 400; 7 Mass., 523; Cobb's Law of Slavery, § 94.

The same principles are applicable to the case of The State v. Patrick, submitted to us with the case under consideration.

The writs of error in these cases are therefore dismissed, for want of jurisdiction.